UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

————————————————————————x

JEAN DANIELS,                                           04-CV-7612 (CM)

        Plaintiff,

     -against-

THE CITY OF NEW YORK,

        Defendant.

————————————————————————x

## DECISION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

     Plaintiff Jean Daniels brings this diversity action against defendant City of New York ("the City"), seeking damages for injuries sustained when plaintiff was assaulted by an intruder in her classroom at Christopher Columbus High School. Plaintiff alleges three separate causes of action: 1) the City acted negligently in its proprietary role as landlord of the high school, 2) the City breached its special duty to protect Ms. Daniels from harm, and 3) the City breached its contract with the United Federation of Teachers ("UFT") by failing to properly implement a school safety plan. Before this court is the City's motion for summary judgment on all three counts.

     For the reasons stated below, defendant City of New York's motion for summary judgment is granted.

## I.  Background

Unless otherwise indicated, the following facts are undisputed.

### A.  *Christopher Columbus High School Hires Ms. Daniels*

In 2003, Ms. Daniels responded to the wide-scale recruitment efforts of the Mayor of New York and the New York City School Chancellor, and applied for a teaching position in a New York public school.  (Affidavit of Jean Daniels ("Daniels Aff.") at ¶ 3.)  Sometime prior to September 2003, Christopher Columbus High School in the Bronx, contacted Ms. Daniels for an interview.

When Ms. Daniels "first appear[ed] at the school," she "immediately became aware of the numerous security measures throughout the school building" (id. at ¶ 4), including metal detection and scanning devices[1] at the school entrances, video surveillance, New York Police Department ("NYPD") officers patrolling the school, automatic door locks, and classroom security telephones. (Id.; see also Frank Giamo Jan. 5, 2006 Dep. Tr. ("Giamo Dep. Tr."), attached as Ex. F to Declaration of Cynthia Goldman ("Goldman Decl."), at 53:7-21; Tammy Brunson May 5, 2006 Dep. Tr. ("Brunson Dep. Tr."), attached as Ex. G to Goldman Decl., at 38:13-16; 40:10; Lisa Fuentes Aug. 31, 2006 Dep. Tr. ("Fuentes Dep. Tr."), attached as Ex. C to Pl. Opp. Br., at 26:13-25; 28:2-9.)  Because of these measures, Ms. Daniels "maintained some real apprehension about the Christopher Columbus High School."  (Daniels Aff. at ¶ 5.)

Despite her apprehension, Ms. Daniels met first with the principal of Christopher

---

[1] At the time of the assault, not all New York City public schools were "scanning" schools.  (Brunson Dep. Tr. at 74:13-16.)  However, schools that contained scanning devices were also required to have NYPD officers conducting on-site patrols.  (Brunson Dep. Tr. at 74:8-12.)

Columbus, Lisa Fuentes. At that interview, Ms. Fuentes "described . . . a physical education

teacher position that was available . . . . My recollection was they primarily just described the

school, and then I had an interview with the assistant principal [Janet Gallardo]." (Jean Daniels

Sept. 16, 2005 Dep. Tr. ("Daniels Dep. Tr."), attached as Ex. E to Goldman Decl., at 16:11-18.)

According to her deposition testimony, Ms. Daniels and Ms. Gallardo,

> Basically just discuss[ed] my prior employment . . . and what my experience has
> been related to the teaching, and described classes – what classes would be like,
> and what the students would be like working in the Bronx, and my keen interest in
> coming back into the teaching field . . . . Separate and apart from that, other than
> the usual employment, you know, interview, I can't remember the specifics of any
> other specifics of the interview.

(Id. at 16:21-17:6.) Moreover, according to Ms. Daniels, "At no time during the interview process

was I ever made aware of any past history within Christopher Columbus High School involving

any assaults and/or other violent crimes." (Daniels Aff. at ¶ 8.) Only after her assault on October

30, 2003, did she learn "that there were numerous prior incidents of criminal activity within [the

school] including assaults similar to that which occurred to me." (Id. at ¶ 30.)

Ms. Daniels's recollection of the interview process is supported by the deposition

testimony of Ms. Fuentes, who also did not recall having any personal discussion with Ms.

Daniels regarding school security or past criminal incidents at the school:

> Q. Did you ever have any individual conversations with Ms. Daniels prior to
> October 30, 2003 where you expressed to her that you believed the school was
> safe?
>
> A. Personally?
>
> Q. Personally.
>
> A. No, I don't recollect.

3

(Fuentes Dep. Tr. 43:10-16; see also id. at 21:14-17.)

Ms. Daniels is correct that numerous criminal activities occurred at the school in the years prior to her employment, including two robberies, one felony assault, and twenty-two misdemeanor assaults in the year before her hiring. (NYPD School Safety Division Individual School Incident Analysis, attached as Ex. D to Pl. Opp. Br.) In light of this criminal activity, the school requested four additional police officers for patrolling duty in Fall 2003, but those requests were denied by the City because the NYPD "didn't have enough officers to assign." (Brunson Dep. Tr. at 45:16-46:10; see also Fuentes Dep. Tr. at 58:20-22.)

Ultimately, the school hired Ms. Daniels as a physical education teacher in "either the end of August or the beginning of September," and she began working at the school in September 2003. (Daniels Dep. Tr. at 17:13-14.) Only after teachers accept a job offer and "enter the school," do they receive a packet containing the school's written regulations – including the school's written rules regarding security – which the teachers are required to review and sign. (Fuentes Dep. Tr. 23:20-24:9.)

**B.  *New Teacher Orientation and Subsequent Security Training***

1. Teacher Orientation

Prior to the beginning of the school year, Ms. Daniels and other new teachers received "a few days orientation" together at the high school, after which they were joined by returning teachers and the orientation continued for each department; Christopher Columbus's physical education department consisted "of about seventeen teachers." (Daniels Dep. Tr. at 17:17-18:4.) The orientation programs regarding school security were presented by Assistant Principal of Security and Discipline, Frank Giamo, and members of his department. (Giamo Dep. Tr. at

4

25:10-21; Brunson Dep. Tr. at 41:6-10.)

During orientation, Ms. Daniels received "written materials to review," including guidelines regarding discipline (Giamo Dep. Tr. at 42:8-43:3); however, she could not "remember the specifics of everything that I was provided," and did not retain any of these materials. (Daniels Dep. Tr. at 18:14-18:22; 19:1-4.) Moreover, although it is unclear whether these materials also included copies of the school's safety plan (Giamo Dep. Tr. at 36:24-37:18), Ms. Daniels testified that she did not recall receiving the safety plan during orientation, nor has she ever reviewed the safety plan that was in effect for Christopher Columbus High School. (Daniels Dep. Tr. at 20:1-3; 66:8-11.)

Ms. Daniels recalled that the orientation topics included "classroom instruction style," the "specific sports" each teacher would be coaching, the school's "guidelines and rules," and "an entire teacher meeting with the principal as relating to a number of school issues; one of which, of course, was security." (Id. at 19:8-16.) According to her deposition, at this meeting, Ms. Daniels and the other new teachers

> were told that we were to use the phones in the rooms if we needed assistance from any security guards. We were provided with extension numbers to be used. And we were certainly told about access to security guards; where they were located, and how to reach them if need should arise . . . . My understanding was that [a security guard] was located at the end of a hallway that had direct access to the gymnasium.

(Id. at 20:13-21:3; 163:19-21; see also Daniels Aff. at ¶ 12; Brunson Dep. Tr. at 53:2-7.) In addition, Ms. Daniels and the other new teachers "were told that if fighting started in the classroom," or if there were intruders in their classrooms, "that we should not get in the middle of it; that we should go to the phone and make a phone call." (Daniels Dep. Tr. at 29:4-7; see also

Brunson Dep. Tr. at 55:18-24.) Moreover, "If we couldn't get access to a security guard, or the security office, that we could call our own office; then we could have access to another teacher coming up with assistance." (Daniels Dep. Tr. at 30:11-16.) Ms. Daniels noted, however, the physical education department did not have a phone. (Id. at 30:17-22.) If any teachers found that their security phones were not working, "they were instructed to notify [the school principal] immediately . . . and normally she would replace the phones to ensure [the teachers] that they have a working phone that they have access to." (Brunson Dep. Tr. at 53:17-23.)

Teachers received additional security training during orientation. For example, teachers who walked out of an unauthorized exit were asked to make sure the exit was closed behind them. (Id. at 79:17-19.) Also, if teachers witnessed "any untowardness going on inside the building," they were "not to get involved but to notify security" immediately. (Id. at 79:20-24.) Teachers were also instructed to keep their classrooms locked in order to keep out unauthorized students. (Id. at 53:24-54:3.)

Significantly, Ms. Daniels testified that all representations made by school officials during orientation regarding security were made to a group of teachers and not to her alone:

> Q. Were any representations made to you orally by anyone employed by the Board of Education or anyone with Christopher Columbus High School regarding security?
>
> * * *
>
> A. Yes. Yes. I think that the representations that were basically made to me were that we would be safe, that we were advised to if we left the building, to leave the building in – at least with another person.
>
> Q. Who made these representations to you?
>
> A. You know, I'm not entirely sure. It could have been other teachers just talking

in general. It could have been at a general staff meeting or an overall teachers'
meeting for the entire school. It's a very large school.

Q. So these were general statements that were made to teachers, not just to you?

A. Right . . . Security was a big issue that, I felt, had been discussed often, in terms
of that we had good security at the school, and that we basically didn't have
anything to fear. It was not something I was really concerned about. Let's put it
like that.

(Daniels Dep. Tr. at 34:4-35:24.)

### 2. Subsequent Security Training

In addition to providing security training during orientation, Mr. Giamo was also

responsible for disseminating all school security information at the monthly faculty conferences

and bi-monthly department meetings. (Giamo Dep. Tr. at 25:10-21; Brunson Dep. Tr. at 41:6-10.)

According to Ms. Fuentes, school security was addressed at these faculty meetings on

approximately three separate occasions prior to the October 30, 2003 assault:

> In general it is discussed how safety is; everyone has to play a role in safety
> including the teachers, the whole community and then we go and teach them ways
> of how to keep themselves safe, how to keep the building safe, how to look out for
> things which ties in the behavior management aspect of running a class; never
> approach a child is always, always stated, never approach a child; always ask for
> assistance, never get into an argument, use the phone system, use the support
> system that has been set up within the building and on and on.

(Fuentes Dep. Tr. 22:2-13.)  According to Ms. Daniels, prior to the October 30, 2003 assault, she

discussed security issues in her classroom with colleagues at these faculty meetings, with her

supervisor, Ms. Gallardo, and with Mr. Giamo. (Daniels Dep. Tr. at 36:4-20; 163:1-9; Giamo

Dep. Tr. at 24:24-25:9.)

### C. Christopher Columbus High School's Safety Plan

According to Ms. Daniels's affidavit, "Pursuant to its written agreement with the United

7

Federation of Teachers, the City of New York, and by extension its Department of Education and Christopher Columbus High School, was required to implement a school safety plan under which teachers would be protected." (Daniels Aff. at ¶ 32.) Accordingly, at the time of the assault, the school maintained a school safety plan that mirrored a template designed by the New York City School Chancellor's office. (Giamo Dep. Tr. at 21:5-14; Fuentes Dep. Tr. at 59:13-15; Brunson Dep. Tr. at 37:6-10.)

    1.  The Department of Security and Discipline

The plan is administered by two separate departments at Christopher Columbus.  First, Mr. Giamo, Assistant Principal of Security and Discipline, is responsible for supervising the non-NYPD members of the school's security team, and for taking "disciplinary actions" for "infractions that the students may have committed inside the building." (Brunson Dep. Tr. at 16:21-24.) These non-NYPD members consist of approximately "ten or eleven" deans (all of whom are teachers in the school), and eight school aides (some of whom are former Christopher Columbus students); all deans and school aides are required to take professional development classes regarding security both before and after they begin working at Christopher Columbus. (Giamo Dep. Tr. at 7:7-20; 23:17-22; 31:6-7; Brunson Dep. Tr. at 33:1.) Although the deans and school aides do not wear a particular uniform while on-duty, or carry a weapon, the deans wear ID tags identifying themselves and carry radios.  (Giamo Dep. Tr. at 26:12-21; 29:19-21; 30:13-31:7; 35:23-24.) While school aides are typically assigned to school exits, locker rooms, and hallways (id. at 27:14-21), deans are generally "assigned to scanning, hall patrol, cafeteria duty or office duty." (Id. at 28:7-8.) Mr. Giamo "make[s] sure that people are on their posts." (Id. at 8:22-24.)

2. The School Safety Division

The second department responsible for implementing the school safety plan is called the School Safety Division ("SSD"), an NYPD agency that works closely with Mr. Giamo's department to "maintain a safe and orderly environment inside the school building." (Fuentes Dep. Tr. at 29:18; Brunson Dep. Tr. at 11:20-23; 13:15.) The SSD adheres to written security guidelines that "basically came out of the patrol guide and administrative guide," both of which were produced by the NYPD. (Brunson Dep. Tr. at 33:20-34:9; 36:18-22.)

The SSD is managed by Tammy Brunson, a Level Three School Safety Agent whose responsibilities include supervising the "school safety agents" – i.e., trained NYPD officers assigned to Christopher Columbus – and monitoring their patrols and scanning activities. (Id. at 11:15-18; 16:18-19.) Although the school safety agents supervised by Ms. Brunson are dressed in NYPD uniforms and carry radios, they are not armed. (Giamo Dep. Tr. at 27:2-8; 36:4-5; Brunson Dep. Tr. at 30:18-24.) In addition to the fifteen police officers under Ms. Brunson's supervision, four uniformed, armed police officers – under the supervision of an NYPD sergeant – are also assigned to patrol the entire school building. (Brunson Dep. Tr. at 30:25-32:12.)

The Christopher Columbus safety plan does not require that a specific number of "school safety agents" be assigned to the school, nor does the plan require the school to position its school safety agents at specific posts for a specific number of hours. (Fuentes Dep. Tr. at 59:21-60:5; Brunson Dep. Tr. at 20:10-23; 21:8; Giamo Dep. Tr. at 14:5-6.) Rather, the number of school safety agents assigned to a school is determined by the "Commanding Officer" for that borough – also a New York police officer who makes the determination based on a review of "incident stats" at a particular school from the preceding year. (Brunson Dep. Tr. at 42:16-44:23.) Also,

9

the positioning and duration of school safety agent posts is at the "discretion" of Ms. Brunson. (Id. at 35:9.)

According to Ms. Brunson, Christopher Columbus was assigned fifteen full-time "school safety agents" at the time of the assault, and Ms. Brunson determined their postings "based on the school needs and the hours of operation of the school building." (Id. at 35:21-24; 42:16-24; 45:4-8.) Thus, Ms. Brunson would place school safety agents only after conferring with Mr. Giamo and Ms. Fuentes. (Id. at 23:10-14; Fuentes Dep. Tr. at 36:10-37:3.) School safety agents are expected to "cover a post assignment that was given by [Brunson], patrol the hallways, conduct verticals and monitor the activities within . . . the school building." (Brunson Dep. Tr. at 2:20-24.) Typically, if Ms. Brunson was unable to assign a school safety agent to a particular post, "Mr. Giamo would try to put a school aide there." (Id. at 48:18-20.)

According to Ms. Brunson, one school safety agent is typically assigned to patrol the entire fourth floor . (Id. at 26:8-18.) Indeed, for the second, third, and fourth floors, only one agent was assigned to patrol each floor from 7:00 a.m. to 4:30 p.m. each day. (Id. at 28:7-25.) From 4:30 p.m. to 9:30 p.m., the School Safety Division had a smaller overtime crew of police officers that were typically assigned to "scanning," "outside dismissal," and the "second floor because that's where they kept their evening classes." (Id. at 29:1-30:13; 36:7-8.) Ms. Brunson further testified that between 4:30 p.m. and 6:00 p.m. on the date of the assault, in addition to the NYPD overtime crew, the school was patrolled by one dean and six school aides; however, none of these individuals were assigned to the fourth floor. (Id. at 83:20-85:21.)

### 3. The Security Telephone System

As previously discussed, the school maintained a security telephone system and instructed

10

all teachers to utilize the system whenever they needed a security guard in their classroom. However, the security phones did not always work. Indeed, Ms. Fuentes testified that security phones broke down "a lot." (Fuentes Dep. Tr. at 35:14.) When security phones broke down, teachers were instructed to "fill[ ] out a white card . . . and submit it to the assistant principal." (Id. at 35:2-7.)

At her deposition, Ms. Daniels testified that she used the security phones several times prior to the assault. When the phones were working, security came to the gym. (Daniels Dep. Tr. at 27:15-28:17.) However, Ms. Daniels stated that "there had been a couple of other instances that I had attempted to get security there and did not get an answer on the other end of the phone." (Id. at 29:20-23.) After these incidents, Ms. Daniels reported the non-working security phone to her supervisor, Ms. Gallardo. (Id. at 30:2-8.)

### D. The Assault

On October 30, 2003, sometime between 4:30 and 5:00 p.m., Ms. Daniels was teaching a volleyball class in the gymnasium located on the fourth floor of the high school, when she noticed two young men enter the gym. She recognized one of the men – Wilson Pugh – as a current Christopher Columbus student, but she did not recognize the other man. (Jean Daniels Mar. 4, 2004 Rule 50(h) Dep. Tr. ("Rule 50(h) Dep. Tr."), attached as Ex. B to Goldman Decl., at 10:3-11:23; Daniels Dep. Tr. at 39:2-42:20.) Neither man was a student in her class, and they did not have permission to be in her classroom. Concerned that the men would disrupt her class, Ms. Daniels walked towards them, blew her whistle, an altercation ensured, and the unknown man struck Ms. Daniels in the left temple. (Rule 50(h) Dep. Tr. at 11:18-12:11; Daniels Dep. Tr. at 43:21-46:3.) The unknown man – later identified as Anthony Smith – immediately vacated the

gym following the altercation.[2] Ms. Daniels then asked Mr. Pugh to locate a security guard, but "he came back to say that there was no one there [on the fourth floor.]" (Rule 50(h) Dep. Tr. at 14:20-22; see also Daniels Dep. Tr. at 49:21-50:12.)

Immediately thereafter, Ms. Daniels gathered her class to discuss what had just occurred. (Rule 50(h) Dep. Tr. at 14:24-15:8; Daniels Dep. Tr. at 50:24-51:17.) Before she could begin the discussion, however, she noticed another student from her next class entering the gym. Ms. Daniels walked towards the student, intending to ask him to wait outside until after she had spoken with her class that just witnessed the altercation. (Rule 50(h) Dep. Tr. at 15:10-23; Daniels Dep. Tr. at 51:10-25.) While doing so, Mr. Smith reentered the gym, approached Ms. Daniels from behind, and punched her in the back of the head, causing her to lose consciousness. (Daniels Dep. Tr. at 58:6-21.) The next thing Ms. Daniels recalls is sitting on a chair in the gym, feeling pain in the back of her head. (Rule 50(h) Dep. Tr. at 16:3-11; Daniels Dep. Tr. at 54:23-55:6.) It was not until after this second assault that security personnel appeared in the fourth floor gymnasium, along with Mr. Giamo. (Daniels Dep. Tr. at 162:17-22.) EMS arrived and she was taken to Jacobi Hospital where she remained overnight. (Rule 50(h) Dep. Tr. at 20:11-14; 33:21-23; Daniels Dep. Tr. at 57:3-19.) Ms. Daniels sustained several serious injuries including a fractured skull, a fractured right rib, and hemorrhaging around the left temple. (Rule 50(h) Dep. Tr. at 30:19-31:11.)

Ms. Daniels did not use the telephone in the gym to notify school security, either before she confronted the two men, or after she was hit in the head. (Daniels Dep. Tr. at 50:13-15.)

---

[2] Although it is unclear from the record whether Mr. Smith was a former or current student, all parties agree that he was an intruder in Ms. Daniels's classroom. (See Brunson Dep. Tr. at 68:11-18.)

Mr. Smith was arrested the next day, October 31, 2003. (NYPD Omniform System Complaint, attached as Ex. H to Goldman Decl.) Although he submitted a handwritten confession regarding his assault on Ms. Daniels, it is somewhat unclear whether his confession encompasses both the initial altercation and the subsequent punching from behind, or just the former. (See Smith Confession, attached as Ex. H to Goldman Decl.) Regardless, the record clearly indicates that Mr. Smith was responsible for both attacks on Ms. Daniels. (See Daniels Dep. Tr. at 58:6-21; Witness Statements, attached as Ex. H to Goldman Decl.)

After the assault on Ms. Daniels, Christopher Columbus High School was designated an "impact school" by the New York City School Chancellor, meaning that the school would receive additional security including six Bronx task force police officers, plus an "additional task force." (Brunson Dep. Tr. at 77:4-12; Fuentes Dep. Tr. at 41:12-17.) The UFT agreed with the Chancellor's decision to name Christopher Columbus an "impact school." (Fuentes Dep. Tr. at 60:13-14.)

## E. Procedural Posture

In accordance with the requirements of her union – Local 2, American Federation of Teachers (AFL-CIO) – Ms. Daniels served a Notice of Claim on the City of New York on January 5, 2004. (Notice of Claim, attached as Ex. A to Goldman Decl.)

After the City refused to adjust her claim, Ms. Daniels commenced the instant lawsuit on September 29, 2004. (Complaint, attached as Ex. C to Goldman Decl.) In her Complaint, Ms. Daniels asserts three separate causes of action: 1) the City acted negligently in its proprietary role

as landlord of Christopher Columbus High School (id. at ¶¶ 18-19),[3] 2) the City breached its special duty owed to Ms. Daniels by "failing to implement, maintain, manage, supervise and/or utilize the school safety plan . . . and protect its teachers" (id. at ¶¶ 31-32), and 3) the City breached its contract with the UFT "by failing to implement, maintain, manage, supervise and/or utilize the school safety plan included" in the contract." (Id. at ¶¶ 24-25.)

The City of New York filed its Answer on November 15, 2004 (Goldman Decl., Ex. D), and now moves for summary judgment on all three counts.  For the reasons stated below, the City's motion is granted.

## II. Standard of Review

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Whether any disputed issue of fact exists is for the court to determine. Balderman v. United States Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to

---

[3] The Complaint catalogues twenty-two allegedly negligent acts or omissions committed by the City as landlord of the high school.  Twenty-one of these acts relate directly either to the school's security system or the school's special duty to keep its teachers safe.  The other allegedly negligent act is the City's failure "to comply with ordinances, agreements, rules, edicts and regulations promulgated by the [City] or other governmental authority." (Complaint at ¶ 18.)

make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Industries Co., 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

### III. Discussion

*A. Negligence*

Ms. Daniels's first cause of action alleges that the City acted negligently in its proprietary role as landlord of Christopher Columbus High School. In its motion for summary judgment, the City argues that this claim fails as a matter of law because the City's alleged misdeeds were committed in its governmental capacity, and the City is therefore immune from liability. The City contends that the gravamen of plaintiff's claim involves security issues, and that courts always deem security to be a governmental function, rather than a proprietary one, and the City is consequently shielded from liability.

15

Plaintiff counters that her assault was the result of the City's "failure to satisfy its obligation of reasonable care in maintaining the property," and that Ms. Daniels's "proprietary claim emanates from" the City's "general responsibility to provide for a safe environment upon its property." (Pl. Opp. Br. at 12.) Ms. Daniels cites the school's "allowing Anthony Smith unauthorized access to the school," its failure to appreciate the danger he presented, its prior history of criminal incidents and its requests for additional guards (denied by the City), as evidence of the City's failure to satisfy its obligations as a landlord.[4] (Id. at 12-14.)

It is well-settled that "public entities are 'immune from negligence claims arising out of the performance of their governmental functions, including police protection, unless the injured person establishes a special relationship with the entity, which would create a specific duty to protect that individual, and the individual relied on the performance of that duty.'"[5] McEnaney v. State, 700 N.Y.S.2d 258, 260 (3d Dep't 1999) (quoting Miller v. State, 62 N.Y.2d 506, 510 (N.Y. 1984)). Conversely, "when the State acts in [a] proprietary capacity it is subject to 'the same principles of tort law as is a private landlord' and it may be found liable for negligence even in the absence of a special duty." Id. at 261 (quoting Miller, 62 N.Y.2d at 511); see also Marilyn S. v. City of New York, 521 N.Y.S.2d 485, 487 (2d Dep't 1987).

---

[4] Ms. Daniels also argues that a question of fact "still remain[s] as to what notice the City of New York had been given as to . . . the overall danger level within [the school]." (Pl. Opp. Br. at 15.) According to Ms. Daniels, this question remains open because she "has not been provided with any records concerning [Anthony Smith] and is thus unable to put forth proof that the City was on notice of the specific danger he presented to his fellow students, teachers and administration alike." (Id. at 14-15.) As discussed below, this fact is not material to the question of whether the City was acting in a governmental or proprietary capacity when it committed the allegedly negligent acts.

[5] The "special duty" exception is discussed in depth below. See Section III.B., infra.

16

Moreover, "Where . . . the [public entity] acted in a dual capacity – i.e., in a proprietary capacity as landowner . . . and in its governmental capacity by providing police protection through . . . security – the courts are directed to scrutinize the claimant's allegations to ascertain where the [public entity's] conduct properly fits along the 'continuum of responsibility' between these proprietary and governmental functions." McEnaney, 700 N.Y.S.2d at 261 (quoting Miller, 62 N.Y.2d at 511). This "continuum" begins with "the public entity's duty to provide simple maintenance of its property such as 'repair of steps or the maintenance of doors' and gradually extends 'out to more complex measures of safety and security for a greater area and populace, whereupon the actions increasingly, and at a certain point only, involve governmental functions, for example, the maintenance of general police . . . protection.'" Id. (quoting Miller, 62 N.Y.2d at 512). Thus, the City's liability turns on "the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred." Id.; see also Miller, 62 N.Y.2d at 513; Porterfield v. City of New York, 573 N.Y.S.2d 681, 681-82 (1st Dep't 1991).

Plaintiff's opposition papers rely exclusively on Miller to support its argument that the City's failure "to provide for a safe environment upon its property" constituted negligence in its proprietary capacity as a landlord. (Pl. Opp. Br. at 12, 14.) That reliance is misplaced. In Miller, a State university student was raped in the basement of her on-campus dormitory by a non-student. She sued the State for failing both to provide adequate police protection and to lock the outer doors of the dormitory. The first theory of liability was dismissed by the trial court because police protection "was held to a governmental activity subject to sovereign immunity." 62 N.Y.2d at 509. The New York Court of Appeals affirmed liability on the second theory, finding the State

had breached its duties as a landlord. However, as the first sentence of the court's opinion makes clear, the application of the court's holding is much narrower than Ms. Daniels argues: "When the State operates housing, it is held to the same duty as private landlords in the maintenance of physical security devices in the building itself." Id. at 508. The court further held that, "Ownership and care relating to buildings *with tenants* has traditionally been carried on through private enterprise, specifically by landlords and thus constitutes a proprietary function when performed by the State." Id. at 513 (emphasis added).

Christopher Columbus High School is not an apartment building, so Miller's applicability to Ms. Daniels's claim is limited. Unfortunately for Ms. Daniels, the heavy weight of authority further indicates that a public entity that provides security in a non-housing context – and particularly in public schools – is acting in its governmental capacity, and not as a landlord.

For example, in McEnaney, a State university student was shot in a lecture hall by another student who had taken the class hostage. The injured student sued the State for its negligent operation of the university and, in particular, for failing to "properly protect the safety of students," for failing to supervise the shooter who the State "should have known" was unbalanced and violent, and for failing to install security phones in the lecture halls. 700 N.Y.S.2d at 259-61. The court unequivocally rejected the notion that these alleged acts were committed in the State's proprietary capacity as landlord:

> In our view, these contentions all challenge the adequacy of [the public university's] overall security system and its particular security provisions and practices. In case after case, the courts of this State have recognized that the provision of security [including campus security] against physical attacks by third parties . . . is a governmental function involving policymaking regarding the nature of the risks presented, and . . . no liability arises from the performance of such a function absent a special duty of protection.

18

Id. at 261 (citing cases) (internal quotations marks and citations omitted) (alteration in original).

Responding to claimant's allegation that the school should have installed security phones, the court stated, "the State's failure to establish, operate and maintain a certain type of phone system in the lecture halls or emergency communication network . . . constitutes allegations of negligent provision of security against criminal acts on campus, a government function." Id. at 262. Similarly, "the State's determination as to . . . whether to enroll or retain a troubled student are governmental functions." Id.; see also Bonner v. City of New York, 73 N.Y.2d 930, 932-33 (N.Y. 1989) (reversing judgment for teacher, where teacher was injured by intruder on school playground and sued City for failing to repair broken playground gate, because gate maintenance was part of school's security system and therefore governmental function); Jacobellis v. City of New York, 602 N.Y.S.2d 877, 877-78 (2d Dep't 1993) (granting summary judgment where teacher was injured attempting to remove weapon-wielding student from classroom and sued City for failing "to keep intercom system in good repair," because alleged negligence "does not stem from [City's] failure to fulfill a proprietary duty."); Porterfield, 573 N.Y.S.2d at 681-82 (affirming dismissal of teacher's claim that she was sexually assaulted in unlocked book room by armed assailant, because claim arose from City's exercise of governmental duties); Marilyn S., 521 N.Y.S.2d at 487 (reversing judgment for teacher, where teacher was sexually assaulted in faculty ladies' room and sued City for maintaining inadequate key distribution system under which keys were likely to fall into unauthorized hands, because key system was aspect of school's security system and therefore a government function).

Here, the gravamen of Ms. Daniels's complaint is the City's alleged failure to provide adequate security in the school building. As noted, plaintiff alleges twenty-two separate negligent

acts by the City, twenty-one of which deal directly with the school's security system.[6]  (Complaint at ¶ 18.)  Her opposition brief argues more specifically that the school was acting in a proprietary capacity when it allowed Anthony Smith unauthorized access to the school without recognizing the danger he presented, and when it failed to increase security even after its recent crime-riddled history.  (Pl. Opp. Br. at 12-14.)  This court cannot view these allegations as anything but a complaint against the City's management of the Christopher Columbus security system, which is a distinctly governmental function.  See Bonner, 73 N.Y.2d at 932; McEnaney, 700 N.Y.S.2d at 261.

It matters not that some of plaintiff's allegations are borne out by the record.  It is true, for example, that the security phones in Ms. Daniels's gymnasium did not always work.  (Daniels Dep. Tr. at 29:20-23; Fuentes Dep. Tr. at 35:14.)  But maintenance of security phones is a governmental function.  Jacobellis, 602 N.Y.S.2d at 877-78.  Similarly, the record demonstrates that no school safety agent, dean or school aide was present on the fourth floor at the time of the assault (Daniels Dep. Tr. at 49:21-50:12), but assigning security guards to specific posts is manifestly part and parcel of the school security system, and therefore a governmental function. Bonner, 73 N.Y.2d at 932.

Moreover, the City's denial of the school's requests for additional security guards just prior to Ms. Daniels's employment – far from constituting evidence of proprietary conduct, as plaintiff argues   is a perfect example of the type of policymaking that is reserved for the City, and from which the City is shielded from liability.  See Riss v. City of New York, 22 N.Y.2d 579,

---

[6] There is simply no evidence in the record to support Ms. Daniels's remaining allegation that City failed "to comply with ordinances, agreements, rules, edicts and regulations promulgated by the [City] or other governmental authority."  (Complaint at ¶ 18.)

581-82 (N.Y. 1968) ("The amount of protection that may be provided is limited by the resources of the community and by a considered legislative-executive decision as to how those resources may be deployed. For the courts to proclaim a new and general duty of protection in the law of tort . . . could and would inevitably determine how the limited police resources of the community should be allocated and without predictable limits . . . .")

Last, while issues of fact exist regarding whether Anthony Smith was a current or former Christopher Columbus student on the date of the assault, and whether "the City was on notice of the specific danger he presented" (Pl. Opp. Br. at 14), these facts are not material to the instant inquiry. If Mr. Smith was indeed a former student, then his unauthorized entrance was a result of the City's operation of the school security system – a governmental function – and the City is therefore immune from liability. On the other hand, if Mr. Smith was a current Christopher Columbus student, it is the City's ultimate decision "whether to enroll or retain a troubled student" and that decision is also a governmental function. McEnaney, 700 N.Y.S.2d at 262.

### B. Breach of Special Duty

Ms. Daniels's second cause of action alleges that the City breached its special duty owed to the plaintiff by failing to properly implement the school safety plan and protect its teachers. The City argues that this cause of action also fails as a matter of law because any statements made by the school regarding security were made to a group of teachers, not to Ms. Daniels individually, and the City therefore never assumed an affirmative duty to protect plaintiff. Furthermore, given that no representations regarding school security were ever made to Ms. Daniels, she could not have relied on any such representations.

In response, Ms. Daniels relies heavily on the following portion of her November 10, 2006

21

affidavit, which was submitted with her November 13, 2006 opposition brief:

> [D]uring the interview process, I met individually with [Ms. Fuentes and Ms.
> Gallardo]. On both occasions, safety and security within the school were discussed
> at length. I was promised that Christopher Columbus High School offered a safe
> environment and that I did not have to fear for my well-being. I was further
> advised that . . . [the school] offered the type of environment whereby special
> efforts were being made, and would always be made, to provide for my safety and
> security . . . . [B]ased upon these explicit representations . . . I accepted a position
> within this school.

(Daniels Aff. at ¶¶ 6-9.)

This statement directly contradicts Ms. Daniels's deposition testimony, in which she

summarized her recollection of the interview process and indicated that neither Ms. Fuentes nor

Ms. Gallardo discussed school security with her. (See Daniels Dep. Tr. at 16:11-17:6; 34:4-

35:24.) Under the law in this Circuit, "a court considering a motion for summary judgment may

not rely on an affidavit that contradicts a party's deposition testimony." Daley v. McNeil

Consumer Prods. Co., 164 F. Supp. 2d 367, 376 (S.D.N.Y. 2001); see also Raskin v. Wyatt Co.,

125 F.3d 55, 63 (2d Cir. 1997) ("[W]e follow the rule that a party may not create an issue of fact

by submitting an affidavit in opposition to a summary judgment motion that, by omission or

addition, contradicts the affiant's previous deposition testimony."). Thus, this court would

normally disregard this portion of the affidavit. However, as discussed below, even if this court

were to rely on the above-quoted statement, Ms. Daniels's claim would still fail as a matter of

law.

In any event, in New York, "it is recognized that the only narrow exception to the general

rule that a municipality cannot be held liable for its failure to protect the public at large from harm

exists when the plaintiff can establish the existence of a special relationship, running from the

22

municipality to the individual or protected group, thereby creating a special duty owed to the plaintiff." Krakower v. City of New York, 629 N.Y.S.2d 435, 436 (1st Dep't 1995); see also Pascucci v. Board of Educ. of the City of New York, 758 N.Y.S.2d 54, 55 (1st Dep't 2003). This rule of law "rests on the principal that a duty to provide police protection ordinarily is one owed to the community at large and not to a specific person. Nevertheless, when a governmental body voluntarily undertakes to act on behalf of a particular person and that person detrimentally relies on that promise, a special duty is created." Genao v. Board of Educ. of City of New York, 888 F. Supp. 501, 508 (S.D.N.Y. 1995).

Thus, the four elements of this special duty are: (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking. Cuffy v. City of New York, 69 N.Y.2d 255, 260 (N.Y. 1987); Pascucci, 758 N.Y.S.2d at 56. Whether a special relationship exists sufficient to confer a corresponding duty upon the public entity is a question of law for the court. Bardavid v. N.Y.C. Transit Auth., 467 N.Y.S.2d 360, 361 (1st Dep't 1983).

In support of her argument that the City affirmatively assumed a duty to act on her behalf, Ms. Daniels relies on Pascucci, the sole case cited by plaintiff in which a court found a public entity owed a special duty to a teacher. In Pascucci, a teacher was injured when she attempted to break up a fight between two students. During the altercation, the teacher called the school secretary three separate times over the intercom to request a security guard; all three times, the secretary answered the phone and acknowledged the teacher's request for help. 758 N.Y.S.2d at

23

55. However, no security guard was sent and after the third phone call to the secretary, the teacher was injured by one of the fighting students. Id. The appellate court reversed the trial court's granting of summary judgment, finding that "a jury could reasonably find that the school secretary's acknowledgment of plaintiff's request for assistance was an implicit promise to act on plaintiff's behalf." Id. at 56.

Here, Ms. Daniels never attempted to use the security phone, nor was she ever promised that help was on the way. So it is therefore difficult to see how Pascucci helps her case. The law is clear that the mere installation of a security phone system does not create a special duty to teachers. Jacobellis, 602 N.Y.S.2d at 878 (finding no special duty owed by City to teacher just because school maintained security intercom system, even where system was defective).

Instead, Ms. Daniels contends that the school assumed a special duty to protect her in that it "had already implemented numerous safety mechanisms . . . includ[ing] metal detection and scanning, door locks, panic bars, video surveillance, patrolling school aids, [NYPD] safety agents, and classroom telephones." (Pl. Opp. Br. at 16-17.) But the fact that the school maintained a comprehensive security system, by itself, does not create a special duty to Ms. Daniels; rather, as discussed above, the City is always immune from suit for injuries arising from the operation of a school security system, unless the plaintiff can demonstrate a special duty. McEnaney, 700 N.Y.S.2d at 261. That principle holds particularly true here, where the Christopher Columbus security system did not change one iota - nor did any school official promise to change the system – after Ms. Daniels joined the faculty.

Ms. Daniels further argues that the school "continued to represent . . . during regular meetings with faculty" that she "should have no concern for her safety and she would always be

24

protected." (Pl. Opp. Br. at 17.) But the fact that the school discussed its safety plan with a

roomful of teachers does not establish a special duty running from the City to all attending faculty

members. See Vitale v. City of New York, 60 N.Y.2d 861, 863 (N.Y. 1983) (finding no special

duty owed by City to teacher assaulted in school hallway, on basis that teacher was beneficiary of

school's security plan); Krakower, 629 N.Y.S.2d at 435-36 (finding neither contract between

Board of Education and UFT, nor New York City School Chancellor's mandate to schools to

implement a school security plan created special duty owed by City to public school teacher

assaulted outside classroom).[7]

Were the court to pay attention to Ms. Daniels's affidavit, the result would not change,

because a school official's representation that a school is safe – without more - does not create a

special duty. See Genao, 888 F. Supp. at 508. In Genao, a teacher at P.S. 194 was assaulted in

her classroom by four intruders, and sued the City for breaching its special duty to protect her.

The evidence established that when the teacher began working at the school, the principal

promised her, "Don't worry. You are in a good school." Id. at 504. The court nonetheless

granted the City's motion for summary judgment, observing that, "By making this statement, [the

principal] did not undertake to perform any particular duties in order to protect plaintiff from a

specific danger." Id. at 508; see also Weinstein v. N.Y.C. Bd. of Educ., 511 N.Y.S.2d 882, 883

(2d Dep't 1987) (finding no special duty created where teacher assaulted in classroom claimed he

relied on security guards who were allegedly absent from posts during assault, because plaintiff

---

[7] Although Ms. Daniels does not argue that the school's alleged promise to post a security
guard on the fourth floor during school hours, created a special duty, I note that such a promise
has potential to create such a duty, except that nothing in the record indicates that she relied on
that promise. Rather, Ms. Daniels only learned of this security posting after she accepted the
teaching position. (Daniels Aff. at ¶¶ 11-12.)

did not "demonstrate[] that the security measures . . . were intended specifically for [his] benefit").

Although Ms. Fuentes and Ms. Gallardo's alleged statements are more promissory in nature than the Genao principal's statements, they nonetheless fall far short of promising to perform a "particular" duty in order to protect Ms. Daniels from a "specific" danger. Instead, these statements are, at best, general promises by school officials that they take security seriously and will continue to do so. As such, these statements do not constitute an affirmative assumption of duty required to create a "special relationship." Cf. Cuffy, 69 N.Y.2d at 259 (holding special duty was created where police assured landlord plaintiff they would arrest abusive tenant "first thing in the morning," plaintiff decided not to move family from dwelling based on this statement, and family was assaulted by tenant the following evening); Sorichetti v. City of New York, 65 N.Y.2d 461, 470-71 (N.Y. 1985) (holding special duty was created where police informed infant plaintiff's mother that patrol car would be sent to retrieve her daughter, none was sent, and infant was seriously injured by father); DeLong v. County of Erie, 455 N.Y.S.2d 887, 892 (4th Dep't 1982) (holding special duty was created where 911 operator responded to emergency plea for help with "Okay, right away," no police were dispatched and victim died; noting that "it is not the establishment of the emergency call system . . . which creates the duty," but the "complaint writer's acceptance of the call, his transmittal of the complaint . . . and the dispatcher's radio calls to the police cars.").[8]

_____

[8] Ms. Daniels's complaint further illustrates her misunderstanding of the special duty doctrine. There, Ms. Daniels contends that the City "creat[ed] a special duty to teachers in general . . . to afford security and protection from harm. (Complaint ¶ 18.) If the City "owed a special duty to teachers employed by said defendant" (id. at ¶ 31) – i.e., all New York City teachers – the duty would hardly be special, "narrow," or "exceptional." Genao, 888 F. Supp. at 508 (special duty occurs in "narrow class of cases"); Sorichetti, 65 N.Y.2d at 468 (special duty only occurs in "extraordinary instances").

26

Because this court finds that Ms. Fuentes and Ms. Gallardo's alleged statements, the
Christopher Columbus school safety plan, and statements made to the faculty regarding this plan,
do not constitute affirmative assumptions of a special duty by the City, it is not necessary for this
court to address the remaining "special duty" elements.

### C. Breach of Contract

Ms. Daniels's final cause of action alleges that the City breached its contract with the UFT
"by failing to implement . . . the school safety plan included therein." (Complaint ¶ 25.) In its
motion papers, the City briefly argues that this claim must be dismissed because "the UFT
contract does not create an affirmative duty upon the Board of Education to provide safety." (Def.
Br. at 2, 12 n.1.) Perhaps recognizing the futility of its claim, Ms. Daniels does not offer any
rebuttal to the City's argument in her opposition papers.

New York courts have repeatedly held that public entities cannot be held liable to
individual teachers for any alleged breaches of a contract between the teachers' union and the
City. See Genao, 888 F. Supp. at 508 (granting summary judgment on teacher's breach of
contract claim and noting, "Although the Contract [between Board and Teachers Association]
does require each principal to develop a comprehensive safety plan, this requirement does not
create a special duty to [plaintiff teacher]"); Krakower, 629 N.Y.S.2d at 436 ("nothing in the
adoption or content of the school security plan promulgated by the contract [between the Board of
Education and the UFT] . . . warranted a finding that the contract created an affirmative duty upon
the Board to provide safety to, or was designed or intended solely and specially for the benefit of,
the plaintiff or other U.F.T. teachers.").

27

In light of this authority, as well as the fact that the otherwise comprehensive record does not contain a copy of the allegedly breached contract, Ms. Daniels's third cause of action must also be dismissed.

## IV. **Conclusion**

For the foregoing reasons, defendant City of New York's motion for summary judgment is granted.

This constitutes the decision and order of the court.

Dated: June 26, 2007

_____

U.S.D.J.

BY FAX TO ALL COUNSEL

28